We'll call the second case, which is 22-13133, Hinkels & Mccoy v. OSHA, or the Occupational Safety and Health Commission. Mr. Connealy here for the petitioner, Ms. Mathis here for the respondent. Mr. Connealy, whenever you're ready. Thank you, Your Honor, and may it please the Court, my name is Michael Connealy and I am representing Petitioner Hinkels & Mccoy in this matter. Your Honor, the Commission committed multiple errors that require setting aside OSHA's citation. And one of those errors infected the Commission's assessment of multiple elements of OSHA's case. That's that error of conflating the potentially hazardous condition of having improperly torqued bolts on the vehicle here, with the mere failure to test whether the bolts were properly torqued. So can I ask you a question and I'll ask your adversary as well. It seems like there's, I don't know if there's confusion or just an inkblot in the papers about whether or not, is there evidence whether these bolts in fact were properly torqued? No. In fact, it's OSHA's position on page 29 of its briefs that no one knows their degree of torque. Our position and our expert, Dr. Stevick, testified that if you looked at the condition of the sister units at the relevant time, they were all within 10% of specification. And so the inference would be that these bolts were probably torqued as well. But let's just take the Secretary's position that there's no evidence one way or the other what the degree of torque was. That should be the end of this dispute. Because by OSHA's own theory of the case, the relevant dangers here depend on improper torque. That's what leads to fastener fatigue, which in turn leads to bolts backing out of the connection, which leads to separation and which can lead to structural collapse. And even Mr. Toon, OSHA's own expert, testified that there'd be no hazard if the level of torque was correct. That's at page 50, 560. But OSHA has also argued that there is a duty to inspect and it's during that inspection that you can find out if the torque is improper and it can fail under a safe environment, correct? Well, the citation here was for alleged improper maintenance. Correct. And as footnote 9 of their brief at page 22 says, indicates the only improper maintenance here of which there could be any evidence at all is the failure to conduct the test. But the problem with defining the hazard as the mere failure to conduct a test is that is also the proposed means of abatement here. So let me ask you this, because I guess one place I'm getting kind of just wrapped around the axle in this case is trying to figure out whether we define the hazard by reference specifically to this case or more abstractly, sort of in the ether. Because it seems to me like, for instance, in a hypothetical where there's an alleged failure to test fire alarms, say there's no accident. It's just like a surprise spot visit by OSHA. And they say, hey, have you been testing your fire alarms? And you're like, no, we haven't tested them in forever. Is that a hazard that could give rise to a risk of death or serious bodily injury, just failing to test the fire alarms? I'm not sure. And there may be a standard on that. Remember, we're dealing with the General Duty Clause here, which is the catch-all when there's Well, I'm just trying to figure out that, yeah, I'm looking at the General Duty Clause and it talks about hazards, right? Recognized hazards. And on the one hand, it seems like a hazard might need to be some, like, physical condition on site, which is good for you, right? I hate to interrupt you, but that is the test under the Commission's Arcadian decision, which says that a hazard is defined in terms of the physical agents that injure employees rather than the means of abatement. So I think that's settled Commission law. Yeah, but, counsel, we've said, as recently as six months ago in Chewy, that, quote, we have equated the phrase condition, practice, means, method, operation, or process with hazard. Correct? That's our law? I'm not familiar with that case, Your Honor, but At that time, could you just repeat the phrase one more time? Sorry. We have equated the phrase condition, practice, means, method, operation, or process, which comes from, I think it's 666K, with hazard. That's the end of the quote. If you're not familiar with it, I don't want to hold you to it, but let's look at Arcadia. Because, yes, you certainly quote one part of Arcadia, but Arcadia also mentions that hazard is a condition of practice, right? Yeah, and we're not fighting that, Your Honor. Right, so it can't be just a physical condition. It could be a practice. Okay, so I want to go back to Judge Newsom's question because it is exactly right, and it's a question that I have. It seems to me that this is a two ships passing in the night kind of situation because let's imagine in a world that this horrible, tragic accident did not happen. And your client, I know you don't think this happened, but your client since 2011 when it signed its contract with Diversified has never tested a single bolt on a single boom on a single Derek truck in its entire fleet throughout the entire country. And that was the state of things from 2011 to 2019 when someone from OSHA decided to go on site and to look and to see that these things were not tight enough. Would it not be a hazard to cite the company for not properly testing the bolts? Your Honor changed the case in a material way. Answer my question first, please. I know I did. Answer my question. If the bolts were not tight enough, that would be a different, that would be. . . Would that be a hazard, a practice or condition which could reasonably, which would be likely to cause a serious injury? If the bolts are not tight enough, yes. Whether they are tight or not tight, if the practice is that they have never checked once, ever, could that not be likely to result in some really bad thing happening? I think in that situation you would need evidence that the condition that we're worried about, improper tightness, is going to naturally happen by the occurrence of. . . which you know could, at some point in time, result in a boom falling and somebody dying. But my point is you don't know that. Of course we know that. It's human condition or experience. The case law even says that. The testimony here from the expert that OSHA put on was that nobody really knows what happens two minutes or 20 years after the initial torquing of the bolts. That's true. But counsel, it doesn't have to actually be a cause. It has to likely be a cause. So it could be two days, and it could be 20 years. Nobody's going to know, but it's a ticking time bomb. Well, it's not a ticking time bomb. If after 20 years the bolts could be at the same tightness. And that's the key difference between this example and the example of the fire detectors. We all know that batteries are going to eventually run out. That's inevitable. But there's no evidence here that the torque on this equipment, on the bolts, was going to eventually become loose enough. Don't we know that from the manufacturer telling us that we need to test it in order to make sure that it's of a specific specificity? Isn't that an indication that you have to check to make sure it's at that specificity because things untighten over time by use? They can untighten over time, but there's no evidence here that they would necessarily. And manufacturers put warning labels on their equipment all the time because they don't want to be held responsible if something bad does happen. But that can't be the basis for a general duty clause. We have to comply with every single warning in a 100-page manual. Hasn't the commission said and we've said that once an accident does happen, that that is pretty good evidence of a likely causation? Well, maybe if the condition that caused the accident is also the condition that's being cited. Failure to test. If you had tested it, you would have found out. Not necessarily. Mr. Toon testified that he was not opining in this case, that if a torque test had been done, the manufacturer's defect would have... Here's where Mr. Toon testified. This is at page 556 of tab 2 of volume 1 of the supplemental appendix. Quote, if in fact, question, if in fact those bolts were exactly the tightness, 295 foot-pounds at the time of the accident, in your opinion, would that be a hazard just because they weren't measured by a torque wrench? Answer, there's no way anybody would know that. Question, so you're not saying it would. I'm saying you wouldn't know. That's why you torque, to eliminate the hazard and eliminate the possibility of this being a problem. And the accident is pretty good prima facie evidence that failing to do it did cause this to happen. It's not prima facie evidence because everyone agrees what caused the accident here was not the looseness of bolts that led the whole thing to collapse. Everyone agrees that the problem that caused the accident here was the bolts that were... I just read you the testimony. He says there's no way that anybody would know that. Mr. Toon said that. That doesn't seem like a concession that it wasn't this, wasn't the tightness of the bolt. What that seems is an indication that we don't know for sure because no one tested it, so it's impossible to know. But an accident happened, and this thing hadn't been tested since 2011. I just want to point to page 560 of the same exchange where a few pages later, the judge asks if the bolts had been torqued to the torque level as designated by the manufacturer in the manual on the day of the accident, would there still be a hazard? Would there still be a citation? Answer, I would say no, and that is exactly right. If the bolts had been to the right torque, there would not have been a hazard by Mr. Toon's own... He's not OSHA, and he's not interpreting the statute. The question of whether it's a hazard is a legal question, and the question that Judge Newsom asked in the beginning and I tried to ask also without a satisfactory answer is if for 15 years somebody doesn't test something and then this thing falls because a bolt pops out, is that not an indication, A, of a possible hazard here, and, B, one that's likely to cause serious injury or death? I think that case would be, but that's not this case because the bolts... What's the difference? What's the principal difference between the two? The principal difference is that the problem that the test was meant to uncover in the hypothetical is a loose bolt that pops out. The problem that led to the accident here was a bolt that had a manufacturer's defect that led to a recall. So I have to confess, like, I recognize that you made the design or manufacturer's defect argument below, but I just didn't see that as being a focus of your briefing to us really at all, that there's like this independent cause. That's because the question under the statute, and I think everybody agrees, isn't what led to this particular accident. And I took the questioning to be asking isn't what led to this particular accident exactly what the test would have uncovered. But that's not that correct inquiry. The correct inquiry, and it's right there in the statute, were there hazards that were causing or likely to cause death or serious physical harm in the workplace or in the employee's employment? And here the only such hazard I think that the record would support, but it didn't actually exist here, is the existence of improperly tightened bolts because there, under the secretary's expert's theory, improperly tightened bolts can wear out over time. But without any evidence that what we did, what my client did was likely to cause improperly tightened bolts, that theory of the case just doesn't carry out. And, Your Honors, obviously we have several other alternative arguments. I see I'm out of time, but if the court has any questions about those, I'd be happy to address them. Okay, great. We'll hear from you on rebuttal as well. Ms. Mathis, let's hear from you. May it please the court, Jessica Mathis for the Secretary of Labor. So, counsel, it seems like the missing link here, and I want you to fill it in for us, is failing to test and bolt failure. Was there any evidence in the record to suggest, forget this accident, this accident is irrelevant for the general duty clause. Is there any evidence in the record to suggest that the failure to test for 15 years or 5 years could have led to some failure of the bolt, meaning it being too loose or too tight or whatever, such that an accident could occur? Not this accident, but that an accident could occur. Yes, Your Honor. Tell me where that is. So, I mean, first of all, I would point the court to the manufacturer's warning, which is on page 257, which specifically says that failure to inspect improperly torqued can cause structural failure. But, so, I mean, I guess I have a question about that. What if the allegation here is that the failure to test or inspect itself is the hazard, right? Yes. How does the failure to test or inspect without anything else cause structural failure? I don't think I understand that. The decal says failure to inspect improperly torqued, the rotation bearing mounting bolts can cause structural failure. But you're not talking about properly torquing. You're just talking about failing to inspect. So how does the failure to inspect cause structural damage? Well, Your Honor, the key point here, I would say, is that torque testing is not just tightening bolts. Torque testing serves several purposes. The first, of course, is to measure and tighten if necessary. The second is applying a preload to the bolt, which effectively, not to get too technical, but effectively protects the bolt from what's called dynamic loading, which can be relatively unpredictable. What you want is static loading, if any loading at all. And preloading effectively does protect the bolt. I understand all of that. I'm sorry to cut you off. I understand all of that. But what I think that Judge Newsom is asking, and I have the same question, is how is this like the fire alarm battery? In other words, your opposing counsel said, and he's not wrong, that we know for a fact that the battery is going to go bad at some point in a reasonable amount of time. Was there some evidence in the record? So you've pointed to one thing, the label, and Judge Newsom asked you about that. Is there anything else in the record to suggest that this is like the battery, that if you don't check and do the things that you're talking about, that there is going to be problems with this thing? And once there's problems with this thing, I think everyone agrees, then some really bad stuff could happen at the back end. Yes, Your Honor. The Secretary's experts specifically testified that eventually tight bolts will fatigue over time from normal use and become hazardous. And this is the Commission's decision, page 5, note 11. The Commission specifically noted this and credited this finding and found it important. And the fire alarm analogy is a really great analogy for this, and it demonstrates that by Hinkle's logic, OSHA would never be able to essentially prevent accidents because the whole purpose of the act is to prevent the very first incident, the very first injury from even occurring. And under the fire alarm analogy, if OSHA was not allowed to issue a citation for not changing the batteries, checking the fire alarm, OSHA would essentially have to wait until the fire alarm doesn't work and there's an incident, which is incredibly dangerous. And I'll have to say, like even with my fire alarm hypo, I mean, some fire alarms are hardwired, and there's no reason to think the battery's ever going to go dead. And still, it just seems a little odd to me that a failure to test a hardwired fire alarm for 15 years doesn't itself give rise to a hazard, that OSHA could never do spot inspections that would give rise to a citation in that circumstance. Right, Your Honor. I mean, I would say that the big distinguishing fact there is that bolts are unpredictable. They do fatigue over time. There isn't really a way to, you know, hardwire them. Yeah, so you're just saying that the bolt failure here is more like the battery-operated fire alarm. But I guess my question, and this is, I guess, kind of a softball for you, but I'll telegraph it to your adversary, is that what about the hardwired fire alarm, where there's really no reason to think that it would fail over time. And yet, my intuition, it could be wrong, my intuition is that failure to test a hardwired fire alarm over the course of 15 years would constitute a practice and thus a hazard within the meaning of the statute. Yes, Your Honor, that's correct. And really, it does not need to be a so-called concrete physical condition even. I mean, there's plenty of case law from the Commission where, for example, in this 1983 case Chevron, the hazard is failure to pressure test a pressurized vessel. And so the failure to pressure test is a lot like what's happening in this case, where I suppose you could say it's not a concrete physical condition, but it is still a practice, a conditioner practice, and that is very much in line with Commission and federal precedent. I just think there has to be some evidence, though, because otherwise OSHA could then point to anything and say, we have a right to inspect that, and if you don't inspect that, you could be cited. So there has to be some evidence to suggest that there could be wear and tear over time that could then lead to what happens. It doesn't have to be an accident, but there has to be something. And so you're telling me, I just want to be clear, that from the label and from that clip of Mr. Toon's testimony that you said, that's where we get that link between this being a condition or this being a condition of failure to test, and failure to test is something that is necessary, because if you don't test it, the results could be really bad. Yes, Your Honor, and I would also point out that although, as my colleague correctly pointed out, the cause of the accident is not an issue here, I would point out that Philip Toon inspected the bolts that came from this machine, and it is a fact,  that is a great example of the purpose of torque testing. It's likely that torque testing would have discovered this damage. Does he say that? Yes, Your Honor. He says that it would have, whatever, even if it was a manufacturer defect, he would have discovered that if it had been tested. I don't think he says that about the manufacturer defect, but I do have things that I would like to say about the manufacturer defect. Sure, but I think there's some other things I want to ask before you get there. Sure. All right, so one of their arguments, and he sort of intimated, your opposing counsel intimated this when he was up here, is if you, so originally the citation says failure to maintain, and that seems to me a little bit broader, and may even include things like actually retorquing if it's deficient, or untorquing if it's too tight, but you've sort of narrowed the field now to the failure to test, right? Is that fair? I would say that that's fair, although, you know, we did define the hazard as did not ensure that the bolts were being properly maintained. I know that's what the citation says, and I know the commission references the citation, but your opposing counsel is right to point out in your brief, I don't know if it's you, but the commission is at pains to say that it's the failure to test. That's what we're talking about here, right? I would say, Your Honor, yes, that the record supports that. Okay. The main issue was the failure to torque test. Okay, and I think that's fair. As I understand the commission, and the Arcadian decision, I think, is the relevant one, there's this rule, wherever it comes from, but there's this rule which seems to suggest that the hazard cannot be the same as the abatement. In other words, you can't define the abatement to be any different than that because there has to be separation between the two. There has to be – it's a separate and independent element that requires its own proof, and so conflating those two sort of conflates the inquiry. It sure seems close to me that if the hazard is the failure to test and the abatement, both in the citation and I think throughout, was if you tested it consistent with the manufacturer's instructions, that then there would be less likelihood of this happening or a material reduction in the risk, as the law says. That seems to be a violation of that commission standard or rule, right? Your Honor, that is a correct statement of the rule, yes. I would respectfully argue that in this case that's not what we have here, though there is a degree of overlap here, but it's actually quite in line with commission precedent. The case that I mentioned before, Chevron Oil, again, the hazard there was failure to pressure test this pressurized vessel, and the abatement in that case was pressure testing the vessel. That's from 1983, though, you said, right? Yes, Your Honor. It seems like the rule has a more recent derivation than that, and maybe I'm wrong on that. So, for instance, we have a case, Getty Oil, which is very similar to that. It may even be the Chevron case you're talking about, but it's from much earlier, and it's similar. It was pressure testing a pressure vessel, and for failing to pressure test the pressure vessel, it led to an accident, and what we said there was the abatement would be testing before you put this in service. Now, we didn't talk about the overlap rule because I suspect the overlap rule wasn't around back then. It seems to be a more recent vintage. So do you have anything more recent vintage since Arcadian that would suggest that similar to what happened here is okay and doesn't violate this rule of identity between the two? Yes, Your Honor. I have a case from 2018, a commission case, Missouri Basin Well Services Incorporated, and in that case the hazard was defined as an unsafe amount of distance between two flammable sources. I think it was a mud tank, a mud pump and a discharge tank, and the proposed abatement there was increasing the distance between these two flammable objects. And the commission specifically said, yes, there is a certain degree of overlap here, and that's actually acceptable because here the important thing is that the citation does identify, A, the physical agents that are at play here, and also, B, names the conditions or practices that the employer exercises control over, and that really made all the difference in that case. And I would argue that this case is exactly like that one, where our citation, we do inform the employer of its obligations, and it's, in my opinion, the same degree of overlap there. I only have a few minutes left, so if the Court doesn't have any further questions on that aspect, I'd like to move to constructive knowledge. Prior to 2007, the rule was torque testing in-house. It was torque testing its own vehicles. In 2007, it entered into this so-called handshake agreement and diversified the specialty contractor here. Can I ask a legal issue with regard to the knowledge? I've read SASR. It doesn't seem to suggest that it's an affirmative defense, the reasonably relying on a third party. Does that mean that that is part of the constructive knowledge element in itself, or where do you get this concept that it's somehow an affirmative defense that then shifts the burden of who has to prove it and all of that? Your Honor, SASR does not, in fact, say that it's an affirmative defense, but a more recent case from the Commission, Manua's, if you'd like the citation, I can give it to you. It's from 2018. This case specifically says at page 4, star 4, that the employer carries the burden of proving the affirmative defense. So it is not, in fact, the constructive knowledge analysis, but I would say that it is somewhat related, yes. If we disagree with you on the affirmative defense part, would it matter here? I'm not sure that it would. Why is that? I think because even looking at the record, looking at the Secretary's arguments, I think that we present a really strong case, and even if it was the Secretary's burden to prove this, I think that the Secretary by and far has. With what evidence? I'm sorry. Well, this is largely because of the larger context of the parties' relationship, and after entering into this so-called handshake agreement, I did want to point out specifically that Diversified affirmatively offered the service of torque testing, and Hinkle's declined. And the parties, there's no evidence in the record that shows that the parties ever negotiated for the service ever again, that it was ever included in any of their contracts, and by looking at the inspection reports, one can clearly see that torque testing was not happening because the results of the torque tests are conspicuously absent. Does it matter if this truck was actually tested or not? In other words, if the hazard is the general failure to test, does it matter whether this particular truck was or was not tested within the last three or four months if company policy generally, at least in a large part, was not to test a large portion of their trucks? Your Honor, I'm not sure that it matters, but it is an undisputed fact that this truck was not torque tested, period. I'd also like to point out that the Sasser defense really does not apply here because in this case, as I pointed out, Hinkle's did maintain control over its fleet, and it also did have this prior experience of doing its own torque testing. It was very much capable of doing so, and I'd like to also point out that, again, there is no evidence on the record that Hinkle's ever inquired as to whether torque testing was happening at all over the course of more than a 10-year business relationship. It is the Secretary's opinion that that is plainly unreasonable, and the reasonable reliance defense would not, therefore, apply.  Thank you. Thank you so much. Thank you. All right, Mr. Connealy, let's hear from you in rebuttal. Thank you, Your Honor. I think it's important to remember that we're dealing here with the general duty clause, and there may be many tests that OSHA thinks are so important, whether it's fire alarms or anything else, and, in fact, OSHA has, in some cases, formulated standards that require testing just as well. The standard that applies to Digger Derrick's doesn't apply here because we're in a telecommunications electrical poles scenario, and even if that standard did apply, I don't think it would require torque testing. There's nothing in that standard that says Digger Derrick's bolts must be torque tested, and I think that that's the fundamental difference between this case and the fire alarm case. We're all familiar with fire alarms. Everyone understands that you have to test them, whether they're battery-operated or electricity-operated, because they can malfunction, and it's such an important thing. Here, if torque testing bolts on a Digger Derrick, which is just one of many components of a very complicated piece of machinery, were so important that they needed to be torque tested regardless of any other signs of a problem, OSHA could say that, and employers would be on notice in that situation. But here, the only notice that employers have, by opposing counsel's own admission, I think, to this court, was the warning label, and the warning label doesn't say you have to torque test every year. It says failure to inspect and properly torque. Is the commission wrong on page 5? Your opposing counsel pointed to this. On page 5 of the commission's order, where it says, Toone, on the other hand, testified that failing to torque test the bolts could result in fatigue failure, which could cause the bolts to back out and fall out of the flange-to-gear ring connection and eventually cause the Digger Derrick to collapse. And again, taking — let's take out this particular accident. Is that — is there not evidence in the record to support that testimony, and would that not be sufficient to show a connection between failure to test and bolt failure? That is not incorrect, but it's key, when you read Mr. Toone's testimony, that the reason — there's a link that the commission doesn't cite here. Torque failure to torque test could result in improperly torqued bolts, which could result in fatigue failure. I mean, that's the key link, and that's the link that there's no evidence of here. If that evidence were here, I would have a very difficult time arguing that there was no hazard. But by Mr. Toone's own admission, there is no evidence of improper torque. No one knows what the torque was. And cabining the general duty clause to at least require, if you're dealing with a testing kind of application, maybe that's a practice, however you want to describe it, if failure to test wouldn't have shown the problem that the test is meant to uncover, then you don't have the hazard that's implicated by that test. And the pressure testing of that pressure vessel example from Getty Oil is an extremely helpful contrast, because there, the equipment exploded as soon as it was put into service. So it would have failed the pressure test. That's the kind of evidence that's missing here. And for that reason and for the other ones we've mentioned in our briefs, unless the court has further questions about the things I haven't been able to discuss, we would ask that the commission's decision be reversed. Very well. Thank you so much.